# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #036

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **29th day of June, 2017**, are as follows:

**BY GENOVESE,J.**:

2016-C-2145     JAMES ROBINSON v. THE BOARD OF SUPERVISORS FOR THE UNIVERSITY OF LOUISIANA SYSTEM AND JOEY STURM, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE FOR THE UNIVERSITY OF LOUISIANA AT LAFAYETTE (Parish of E. Baton Rouge)

For the reasons set forth above, we affirm the jury's finding of age discrimination in favor of plaintiff, James Robinson. However, we find that the jury's damage award of $367,918.00 is not supported by the record; therefore, we amend the jury's damage award to $207,000.00, and affirm the award as amended. Costs are assessed seventy-five percent to defendant, the Board of Supervisors for the University of Louisiana System, and twenty-five percent to plaintiff, James Robinson.
AFFIRMED AS AMENDED

WEIMER, J., dissents and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2016-C-2145

### JAMES ROBINSON

### VERSUS

### THE BOARD OF SUPERVISORS FOR THE UNIVERSITY OF LOUISIANA SYSTEM AND JOEY STRUM, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE FOR THE UNIVERSITY OF LOUISIANA AT LAFAYETTE

### ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FIRST CIRCUIT, PARISH OF EAST BATON ROUGE

**GENOVESE, Justice.**

This suit for alleged age discrimination was instituted by plaintiff, James Robinson,[1] against his employer, the Board of Supervisors for the University of Louisiana System (ULL).[2] We granted this writ of certiorari to review the district court's judgment in accordance with a jury verdict finding that ULL discriminated against Robinson based on his age and awarding him damages. After reviewing the record of these proceedings, as to liability, we find no legal or manifest error in the jury's verdict in favor of plaintiff; thus, we affirm the jury's finding of age discrimination in favor of Robinson. However, as to damages, we find that the amount of the jury's damage award of $367,918.00 is not supported by the record. Therefore, we amend the judgment in part and affirm the jury's damage award as amended herein.

---

[1] Robinson filed his petition after having received a "right to sue" letter from the United States Equal Employment Opportunity Commission permitting him to file suit.

[2] Robinson's petition also named Joey Sturm, individually and in his official capacity as the Chief of Police for ULL, as a defendant. Robinson's petition also included a claim for breach of contract; however, the breach of contract claim against ULL and Chief Sturm and the claim of age-based employment discrimination against Chief Sturm individually were voluntarily dismissed.

**FACTS AND PROCEDURAL HISTORY**

In 1971, James Robinson, at the age of twenty-seven, was hired at the University of Southwestern Louisiana, presently the University of Louisiana at Lafayette (ULL), defendant herein, in the security department, which later became the campus police department. In 1980, Officer Robinson was promoted by Police Chief Joey Sturm and obtained the rank of Captain, the second highest rank in the chain of command of the ULLPD. Captain Robinson was appointed ULL police department (ULLPD) evidence custodian in 1999 by Chief Sturm, and, in that capacity, he was solely responsible for the contents of the evidence room.

In 2002, Chief Sturm left the ULLPD and pursued other employment opportunities. During Chief Sturm's absence, from 2002 until his subsequent return to the ULLPD in 2009, Captain Robinson served as Interim Chief on three separate occasions. Near the end of 2010, Joey Sturm returned to ULL, again as campus police chief. At the direction of Chief Sturm, the ULLPD began to implement organizational and policy changes.[3] In keeping with Louisiana Civil Service Requirements, many ULLPD officers received salary and rank increases. Captain Robinson benefitted as a result thereof and was promoted by Chief Sturm to Police Major A, continuing as the second highest in the chain of command of the ULLPD, effective October 27, 2010. Major Robinson was then sixty-six years of age and the oldest ULLPD employee, with most of the employees being in their early forties.

Near the end of 2010, O.K. Allen Hall, the building housing the evidence room, was scheduled to undergo renovations. Plans were made for the contents of the evidence room to be physically relocated to a new facility. In December 2010,

---

[3] The reorganization of the ULLPD by Chief Sturm transformed the department from a community-based policing operation to an intelligence-led policing organization.

Chief Sturm directed Major Robinson to conduct an audit of the contents of the evidence room prior to its relocation. Once accomplished, the evidence room custodian duty was to be transferred from Major Robinson to Officer Billy Abrams. The evidence room had been located in O.K. Allen Hall since 1999, and its relocation was a significant undertaking. Major Robinson requested the assistance of Officer Daniel Mendoza to accomplish the move to the new facility known as the Creamery Building.

By the end of 2010, the ULLPD evidence room had been relocated to the Creamery; however, the audit had not been done. In March 2011, Major Robinson received an unsatisfactory work performance evaluation from Chief Sturm, his first negative evaluation since beginning his employment with ULLPD back in 1971. Also in March 2011, Major Robinson's duties as custodian of the evidence room were taken from him and given to Officer Abrams, a lower ranking officer. On March 15, 2011, Chief Sturm recommended to the ULL Vice President of Student Affairs, Dean Edward Pratt, that disciplinary action be taken against Major Robinson, citing insubordination in failing to follow direct orders relative to the audit and transfer process of the evidence room. Chief Sturm agreed to reduce his recommendation of a five-day suspension to a three-day suspension, given Major Robinson's past work history, after discussions with ULL's Human Resource Director, Charlene Hamilton.

Major Robinson executed the requisite paperwork on May 9, 2011, certifying his intent to retire effective July 15, 2011. Subsequently, Chief Sturm's proposed disciplinary action was rescinded upon Major Robinson certifying his retirement plans.

Major Robinson became the subject of an internal affairs investigation in May 2011 over alleged missing evidence. Chief Sturm instituted the internal affairs

investigation, which was to be conducted by Lieutenant Michael Louviere, ULLPD's Investigative Lieutenant. Lieutenant Louviere's investigation substantiated misconduct for unsatisfactory performance on the part of Major Robinson. Chief Sturm drafted a letter to Major Robinson in June 2011 advising him of the internal investigation findings. The letter was forwarded to the Human Resources Department (HR); however, disciplinary action was withheld due to Major Robinson's retirement effective July 15, 2011.

Major Robinson was given a new assignment by Chief Sturm to patrol the Primate Research Center (Primate Center) in New Iberia, Louisiana, on May 23, 2011. This new assignment as a patrolman was not in conformity with Major Robinson's classification as a Police Major A, although his salary remained unchanged.

Major Robinson retired on July 15, 2011. By the time of his retirement, Major Robinson had been employed at ULL for forty years and was sixty-seven years old.

In August 2012, Major Robinson filed the present suit for damages based upon age-based employment discrimination by the ULLPD under both federal and state law. Following a trial by jury, a verdict was rendered in favor of Major Robinson for $367,918.00. A judgment was signed by the district court in conformity with the jury verdict, and Major Robinson was awarded attorney fees and court costs. That verdict was appealed to the First Circuit Court of Appeal, which affirmed the jury verdict finding that Major Robinson had successfully established a prima facie case of age discrimination. Additionally, the appellate court found that the jury permissibly rejected ULL's proffered legitimate, non-discriminatory reason for its actions and found that a rational fact-finder could conclude that the action was discriminatory. *Robinson v. Bd. of Supervisors for Univ. of La. Sys.*, 15-1717 (La.App. 1 Cir. 11/4/16), 208 So.3d 511 (Chutz, J., dissents and assigns reasons).

4

ULL then filed an application for certiorari with this Court, which was granted by order of February 3, 2017. *Robinson v. Bd. of Supervisors for Univ. of La. Sys.*, 16-2145 (La. 2/3/17), --- So.3d ---.

## DISCUSSION

**Standard of Review**

The trial court's findings of fact may not be reversed unless they are manifestly erroneous or clearly wrong. *Stobart v. State of Louisiana, through Dep't Transp. & Dev.*, 617 So.2d 880, 882 (La.1993). The issue to be resolved by a reviewing court is not whether the jury was right or wrong, but whether the conclusion reached was a reasonable one. *Id.* When there is conflict in the testimony, a jury's reasonable evaluations of credibility and reasonable inferences of facts should not be disturbed, even though an appellate court may feel that its own evaluations and inferences are reasonable. *Id.* The reviewing court must remain mindful that if the "jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighted the evidence differently." *Id.* at 882-83 (citing *Housley v. Cerise*, 579 So.2d 973 (La.1991)) (quoting *Sistler v. Liberty Mut'l Ins. Co.*, 558 So.2d 1106, 1112 (La.1990)). Additionally, where there are two permissible views of the evidence, the jury's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* (citing *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973)).

This Court has repeatedly emphasized the deference due to the trier of fact, stating:

> [A]n appellate court on review must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently:

5

> [w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell*, 549 So.2d at 844-45 (citations omitted).

> While we understand and appreciate the reality that many times we would have judged the case differently had we been the trier of fact, this is not our function as a reviewing court. *Menard v. Lafayette Ins. Co.*, 09-1869, p. 21 (La.3/16/10), 31 So.3d 996, 1011.

*Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592, pp. 9-10 (La. 12/8/15), 193 So.3d 1110, 1116.

**Age Discrimination**

Major Robinson's claims of age discrimination are based upon alleged violations of the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, and Louisiana's Age Discrimination Employment Act (LADEA), La.R.S. 23:311–314, which make it unlawful for an employer to discharge any individual or otherwise discriminate against an individual with respect to compensation, or terms, conditions, or privileges of employment because of the individual's age. 29 U.S.C. § 623; La.R.S. 23:312(A)(1). Because the LADEA "is identical to the federal statute prohibiting age discrimination, Louisiana courts have traditionally looked to federal case law for guidance." *LaBove v. Raftery*, 00-1394, 00-1423, p. 9 (La. 11/28/01), 802 So.2d 566, 573 (footnote omitted).

Under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), in order to establish a prima facie case of employment discrimination based on age, a plaintiff must prove that: (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge or demotion; and (4) he was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age. *Eastin v. Entergy Corp.*, 09-0293, p. 34 (La.App. 5 Cir. 7/27/10), 42 So.3d 1163, 1185-86 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). The establishment of a prima facie case raises an inference of unlawful discrimination. *Id.* at 1186 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000)).

If the plaintiff can establish a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory purpose for the adverse employment action. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093 (1981)) (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). The defendant must point to admissible evidence in the record, but the burden is one of production, not persuasion. *Id.* (citing *Texas Dep't of Cmty. Affairs*, 450 U.S. at 254, 101 S.Ct. at 1094-95).

If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to show that any non-discriminatory reasons articulated by the employer are not true reasons, but only pretexts. *Id.* (citing *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253, 101 S.Ct. at 1093); *McDonnel Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. This may be accomplished either directly, by showing that a discriminatory reason more than likely motivated the employer, or indirectly, by showing that the asserted reason is unworthy of credence. *Eastin*, 42 So.3d at 1186 (citing *Texas*

*Dep't of Cmty. Affairs*, 450 U.S. at 256, 101 S.Ct. at 1095); *McDonnel Douglas*, 411 U.S. at 804-05, 93 S.Ct. at 1825-26.

The ultimate burden of proof remains with the plaintiff to prove by a preponderance of the evidence that age was the "but-for" cause of the adverse employment action. *Eastin*, 42 So.3d at 1182 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S.Ct. 2343, 2352 (2009)). The rejection by the factfinder of an employer's proffered legitimate, non-discriminatory reason for the adverse employment action does not compel a judgment in favor of a plaintiff. *Reeves*, 530 U.S. at 147-48, 120 S.Ct. at 2108 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993)). The factfinder's rejection, together with the elements of plaintiff's prima facie case, permits a trier of fact to infer the ultimate fact of intentional discrimination. *Reeves*, 530 U.S. at 148, 120 S.Ct. at 2109; *Eastin*, 42 So.3d at 1186-87.

ULL contends that Major Robinson failed in his burden of proving that he was unlawfully discriminated against as an employee of the ULLPD due to his age and that he was forced to retire as a result of these discriminatory practices. ULL argues that the First Circuit Court of Appeal erred in not holding Major Robinson to the more demanding "but-for" burden of proof required in ADEA cases following *Gross*, 577 U.S. 167, 180, 129 S.Ct. 2343, 2352. Its argument is two-fold. First, ULL argues that in the instant matter, there is no evidence that an adverse employment action occurred. Second, it asserts that the evidence is insufficient to prove that the adverse action would not have occurred without Robinson's advanced age.

*Adverse Employment Action*

On May 9, 2011, Major Robinson signed papers indicating his retirement effective July 11, 2011. According to ULL, the only possible adverse employment

8

action prior to this date was the letter of reprimand issued by Chief Sturm, which was never carried out in light of Robinson's imminent retirement. ULL disputes Major Robinson's self-serving testimony that he was forced to resign. ULL argues that Major Robinson was never demoted, never had his salary reduced, and was never offered an early retirement or a continuation of employment under less favorable terms.

An age discrimination claim can be grounded on a theory of constructive discharge. The jury in this case was charged with the rule of law that a plaintiff can prove that he suffered wrongful discrimination on the basis of age by showing that he was constructively discharged. A constructive discharge occurs when an employee quits their job under circumstances that are treated as an involuntary termination. *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004). If an employee's working conditions are deliberately made so intolerable that the employee is forced to involuntarily resign, such constitutes a constructive discharge. *Id.* (quoting *Young v. Sw. Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)). The inquiry is case-and-fact specific, and the relevant factors which may be present singularly or in combination include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger (or less experienced/qualified) supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement (or continued employment on terms less favorable than the employee's former status). *Id.* at 649-50 (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)). Making a determination of a constructive discharge requires that a "reasonable employee" test be employed. *Id.* at 650. The "reasonable employee" test is an objective test of whether a reasonable person in the employee's shoes would have felt compelled to

resign. *Id.* (citing *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 n. 19 (5th Cir.1994)).

Thus, we must consider whether the record reasonably supports the jury's implicit determination that ULL constructively discharged Major Robinson. We conclude that it does. Evidence of Major Robinson's constructive discharge includes a combination of the factors delineated above. Additionally, the record supports a determination that adverse employment action was taken against Major Robinson prior to his signing of the retirement papers. The adverse treatment of Major Robinson also continued thereafter.

Major Robinson testified that he was forced to resign. He explained that he felt he had been "deleted" from the ULLPD when he was omitted from command staff meetings and when his job responsibilities began to be taken from him. According to Major Robinson, he had planned to work at the ULLPD three more years due to financial issues. He spoke to the HR Director, Charlene Hamilton, in March 2011, and questioned whether he had enough years to retire, but he denied advising Ms. Hamilton at that time that he wanted to retire. Despite his intention to remain employed with ULLPD for another three years, Major Robinson signed paperwork on May 9, 2011, indicating an effective retirement date of July 11, 2011.[4]

Sergeant Tony Johnson testified that Chief Sturm had limited interaction with Major Robinson. He also confirmed Major Robinson's exclusion from closed-door meetings Chief Sturm held with the command staff, his reliance on Lieutenant Larry Zerangue, instead of the true second in command, and the preferential treatment given to lower ranking employees who, unlike Major Robinson, were allowed the use of a ULLPD credit card, and who were provided iPads and iPhones. Officer

---

[4] Major Robinson also testified that after signing his retirement papers in May 2011, he could have changed his mind and elected not to retire in July 2011. The record contains no evidence either in support of or in contravention of this testimony.

Michelle Broussard echoed this testimony, describing how the chain of command was not followed by Chief Sturm and that closed-door meetings were held without Major Robinson. Officer Broussard agreed that it was a common sentiment at the ULLPD that Major Robinson was not treated with the respect that he deserved. Due to the palpable tension, Officer Broussard testified that she began to avoid going into the office. In Officer Broussard's opinion, Major Robinson was forced out of his job.

The record also contains other evidence of Major Robinson being subjected to embarrassment, humiliation, and to treatment with less respect than that deserved by a Major and second in the chain of command of the ULLPD. Major Robinson and Officer Mendoza testified that Chief Sturm yelled at him, called him names, and called him incompetent. This treatment of Major Robison by Chief Sturm had a negative impact on Major Robinson's stature among other members of the ULLPD. As discussed further below, Sergeant Johnson testified about the open and repeated negative statements made about Major Robinson related to his age, which began only after Chief Sturm's return to ULLPD.

In January 2011, Chief Sturm removed Major Robinson's duty as patrol commander. According to Sergeant Johnson, he was told by Lieutenant Charles Gisclair that he was not to report anything to Major Robinson anymore; rather, all patrol activities were to be reported to Lieutenant Zerangue. Sergeant Johnson explained that basically all of Major Robinson's duties were taken from him. Thereafter, Major Robinson was also relieved of his payroll duties. As of March 2011, Chief Sturm relieved Major Robinson of his duties as evidence custodian.[5] The reduction of Major Robinson's job duties continued to the degree that Chief

_____

[5] Major Robinson maintains that his duties as evidence custodian were taken from him in December 2010.

Sturm himself admitted that by the time Major Robinson was assigned to the primate center, "[h]e had no duties at that point." Chief Sturm had "removed them all from him." Moreover, all of Major Robinson's duties were assigned to lower ranking ULLPD officers.

We find that the record reasonably supports the conclusion that Major Robinson's duties were taken from him prior to May 2011, and that these duties were reassigned to subordinates. In addition to being stripped of his duties, Major Robinson was subjected to embarrassing and demeaning behavior by Chief Sturm, who also ostracized him from command staff meetings, who yelled at him, who called him incompetent, and who called him names within earshot of lower ranking officers.

Finally, we do not find the lack of a reduction in Major Robinson's salary to be determinative of whether he suffered an adverse employment action. The factors delineated in *Brown*, 237 F.3d 556, may exist singularly or in combination and are case-and-fact specific. *Haley*, 391 F.3d at 649. The lack of a reduction in salary is but one of the factors, and its absence does not necessarily negate a finding of an adverse employment action.

*Preferred Legitimate, Non-Discriminatory Reason*

ULL argues that even if Major Robinson proved a constructive discharge, he failed to prove that his age was the "but-for" cause of his discharge. *Gross*, 577 U.S. 167, 129 S.Ct. 2343. In *Gross*, the Court concluded that the ADEA requires proof that the prohibited criterion was the "but-for" cause of the prohibited conduct. In other words, a plaintiff in an age discrimination case must establish by a preponderance of the evidence that age was the "but-for" reason the employer took the adverse action, rather than simply a motivating factor. *Gross*, 577 U.S. at 180, 129 S.Ct. at 2352. ULL maintains that the legitimate, non-discriminatory reason for

the adverse employment action, if any, was the result of Major Robinson's insubordination.

ULL asserts that it is nonsensical to contend that Chief Sturm would have promoted Captain Robinson to Major Robinson only to begin acting with age-discriminatory intent six weeks later. It was the testimony of Chief Sturm that he was not obligated to promote Captain Robinson to the position of Major, but, instead, he could have given that position to another officer or he could have hired from outside of the ULLPD. Chief Sturm chose Major Robinson, and the problems only arose subsequently, when Major Robinson failed to follow Chief Sturm's directives.

ULL argues that there is evidence of its stated non-discriminatory reason of insubordination based upon the testimony of Chief Sturm and documentation beginning with his December 14, 2010 email to Major Robinson. In that email, Chief Sturm directed Major Robinson to perform an audit of the evidence room and to report back to him on the progress. Major Robinson failed to do so. Again, on December 15, 2010, Chief Sturm emailed Major Robinson with a written reprimand for failing to respond. Therefore, in February 2011, Chief Sturm emailed Major Robinson again stating, "[Y]ou still have not followed direction nor have you taken charge of the project." Frustrated at the lack of response, Chief Sturm sent Major Robinson a letter on March 1, 2011, relieving him of his duties as evidence custodian. On March 15, 2011, Chief Sturm wrote the Vice President of Student Affairs and recommended a five-day suspension for Major Robinson's failure to follow his directions. Chief Sturm agreed to reduce the recommended suspension to three days at the urging of the HR Director, Ms. Hamilton. Notably, ULL points to Ms. Hamilton's testimony that she discussed the recommended suspension with Major Robinson, that it was Major Robinson who chose not to respond to the

reprimand, and that it was Major Robinson who, instead of responding, chose to retire.

*Evidence of Pretext*

Major Robinson maintains that the jury's verdict of age discrimination and its rejection of ULL's proffered legitimate, non-discriminatory reason for its action are supported by age-based comments, disparate treatment, and the building of an unjustified file against him by Chief Sturm. Major Robinson asserts that Chief Sturm's negative and disrespectful treatment of him "infected" other officers of the ULLPD, who made negative statements directed at him due to his age. Major Robinson argues that Chief Sturm's treatment of him and the manner in which he undermined his authority had a detrimental effect on his stature and the respect he previously held in the department. The fact that such comments were made was admitted at trial by ULL's own employees, and they were unrefuted.

Officer Johnson testified that the command staff, including Lieutenant Gisclair, Lieutenant Stelly, and Lieutenant Zerangue, would talk openly and negatively about Major Robinson's age. Statements were made such as: "He does not know what he is doing. He has gotten too old. He has been here too long. He needs to retire or go home." Further, comments were made in the office by ULLPD officers that Major Robinson was not provided with an iPhone and an iPad (which were provided to others) because Major Robinson was too old and he would not know how to use them. Officer Johnson characterized statements about Major Robinson's need to retire as being "regular office discussion" and of a "regular occurrence."

ULL discounts the relevance of the age-animus statements made by the officers of the ULLPD. ULL relies on *Wyvill v. United Companies Life Insurance*,

212 F.3d 296 (5th Cir. 2000), *cert. denied*, 531 U.S. 1145, 121 S.Ct 1081 (2001), to discount the probative value of these statements to demonstrate discrimination. However, we are not persuaded, nor do we agree that the reasoning of *Wyvill* renders the subject remarks irrelevant. We find that the nature and frequency of these remarks directed at Major Robinson, which were clearly based upon age, while not necessarily determinative of discrimination, are certainly probative. Additionally, these age-based remarks, which were heard by the jury, along with the other evidence presented by Major Robinson, provide a reasonable and legal basis for the conclusions reached by the jury.

In *Wyvill*, the court characterized generalized age related statements as "stray remarks" which the court did not find to be temporally stated with the employee's termination. *Id.* at 304. These facts differ significantly from the instant matter where the remarks were being made during the same time period that Chief Sturm was stripping away Major Robinson's duties. The remarks were also a regular and repeated occurrence, and they were being made by more than one person. Although the age-animus comments were being made by officers lower in rank by virtue of their titles, these individuals, in truth and in fact, had been elevated over Major Robinson, who remained the second in command in title only.

The *Wyvill* decision was not without criticism and rebuke, as evidenced by the fifth circuit decision in *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577-78, (5th Cir. 2003), *cert. denied*, 540 U.S. 1184, 124 S.Ct. 1441 (2004) (footnote omitted), wherein the court opined:

> Relying on *Wyvill*, a pre-*Reeves* decision,[6] the court found the remarks insufficient to create an inference of discriminatory intent. *Wyvill* stated that, for an age-based comment to be probative of an employer's discriminatory intent, it must be "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions

---
[6] *Reeves*, 530 U.S. 133, 120 S.Ct. 2097.

that age was a determinative factor in the decision to terminate the employee." 212 F.3d at 304. After *Reeves*, however, so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent.

> . . . .

> Post-*Reeves*, this court has taken a more "cautious" view of the stray remark doctrine discussed in *Wyvill*. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 (5th Cir.2000). Age-related remarks "are appropriately taken into account when analyzing the evidence supporting the jury's verdict," even where the comment is not in the direct context of the termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision. *Id.*

More recently, in *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012), the court expounded on a plaintiff's use of allegedly discriminatory comments made by co-workers in making a discrimination claim and distinguished between the use of such remarks as direct evidence from those offered as additional circumstantial evidence, stating:

> Where a plaintiff offers remarks as circumstantial evidence alongside other alleged discriminatory conduct, however, we apply a more flexible two-part test. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir.2000). In that circumstance, a plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker. *See Laxton*[ *v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003)] (citing *Russell*, 235 F.3d at 226).

Considering the foregoing, we are unpersuaded by *Wyvill*, and we find, based upon *Reeves*, that negative age-based comments that are direct, unambiguous, and of temporal proximity to the adverse employment action, when considered in combination with other circumstantial evidence of pretext, are probative of discriminatory intent. Considering the record in this case, the nature and frequency of the negative age-based statements, and the timing in which these statements arose, along with the additional circumstantial evidence that was presented to the jury, we find the remarks to be probative.

Finally, relative to the second component set forth in *Reeves*, that the comments need to be made by the decision maker or those in a position to influence the decision, we find that the record reasonably supports the conclusion that the officers with the ULLPD who made these age-animus statements directed toward Major Robinson had such influence. Though technically considered lower ranking officers, these officers, for all practical purposes, had ascended in rank over Major Robinson. His prior job duties were now their job duties. Although not formally in title, but in truth and in fact, they were his superiors; and, they were part of the ULLPD command staff. Given their status, these individuals were in positions to influence, and did influence, the decision maker.

After thirty-nine years of unblemished employment at ULL, and being viewed as the "go to guy" in the ULLPD, according to Major Robinson, Chief Sturm used the significant task of relocating the evidence room from O.K. Allen Hall to a new facility as an opportunity to denigrate him and "paper" his file with baseless criticism. Major Robinson asserts that the documentary evidence and the testimony of Chief Sturm, when compared to that of all other witnesses—Lieutenant Zerangue,[7] Officer Mendoza, Lieutenant Broussard, and Sergeant Johnson—reveal Chief Sturm's true motivation and demonstrate that it was to create a justification for stripping him of all of his duties as Major predominantly due to and because of his age. Ultimately, Chief Sturm's goal was to frustrate and humiliate this sixty-six-year-old, forty-year employee, to the extent that he would remove himself from his employ, which he ultimately did.

O.K. Allen Hall was described as a rat-infested, dingy building with paint peeling from the walls, and likely to contain asbestos. This condition was confirmed

---

[7] According to the record, by the time of the trial, Lieutenant Zerangue had obtained the title of Major; however, for consistency and clarity, we refer to him as Lieutenant throughout this opinion.

by all of the officers who joked that the rats kept returning because they were consuming the drugs stored therein. Despite the less than desirable facility, Major Robinson historically had been able to manage the evidence and to meet the demands of the district attorneys who needed the evidence for purposes of pursuing convictions for crimes committed on campus.

Notably, Chief Sturm had observed the evidence room a short time prior to the relocation plans getting underway, and he did not express outrage or displeasure in any form. The beginning of the documentation of unsatisfactory conduct of Major Robinson began December 14, 2010, via email from Chief Sturm to Major Robinson, when he requested Major Robinson to perform the audit and to acknowledge receipt of the email. Major Robinson was also instructed to provide Chief Sturm with written updates on his progress.

The evidence room had never previously been audited, and Major Robinson advised Chief Sturm that he did not know how to perform an audit. Although Chief Sturm testified that he issued the written reprimand on December 15, 2010, for Major Robinson's failure to respond, Major Robinson testified that he had always communicated verbally with Chief Sturm, and, after receiving the December 14, 2010 email, he acted accordingly. Major Robinson also stated that he advised Chief Sturm that his email was not working properly. Officer Abrams corroborated this testimony, stating that he had looked into the email problem and that he had determined that Major Robinson had been given a bad email address.

Major Robinson maintains that the testimony of Chief Sturm was contradicted by the other ULLPD officers in many respects. Chief Sturm testified that after being asked to help Major Robinson, Officer Mendoza came to his office "visibly shaken" after seeing the condition of the evidence room. Chief Sturm further testified that

18

Officer Mendoza advised him that Major Robinson was going to throw away some of the evidence stored in the O.K. Allen facility at that time.

Major Robinson testified that after receiving the December 14, 2010 email, he spoke to Chief Sturm about his lack of knowledge on how to conduct an audit. Major Robinson asked Officer Mendoza for help in completing the task. It was Officer Mendoza's testimony that he went to speak to Chief Sturm so that he would not be held responsible for missing or unaccounted for evidence. Officer Mendoza's concern arose from the evidence not being bagged any longer, and some of it now being out of the bags and on the floor. Officer Mendoza also denied telling Chief Sturm that Major Robinson was going to throw away evidence. Following the conversation, Officer Billy Abrams was placed in charge of the evidence room and the evidence, and Lieutenant Zerangue was to oversee Officer Abrams.

Lieutenant Zerangue's testimony concerning the audit process and the relocation of the evidence also differed from Chief Sturm's. Lieutenant Zerangue testified that because of the construction at O.K. Allen Hall, the moving of the evidence to the new location had to be done very quickly. Despite Major Robinson being criticized for his inaction, Lieutenant Zerangue testified that the evidence was in fact moved to the Creamery in December 2010, prior to the audit being done, and that the audit process could not and did not begin until March 2011. Additionally, Lieutenant Zerangue knew that the audit process would take more than six months to complete. According to Lieutenant Zerangue, the auditing process was still ongoing at the time of the trial, over two years later.

Chief Sturm's testimony also differed from that of Officer Mendoza and Lieutenant Zerangue on who was in charge of the relocation. While Chief Sturm insisted that Major Robinson failed to follow through on his directives, these individuals testified that in December 2010, it was the two of them, along with

Officer Abrams, who were in charge of the move. Major Robinson had already been relieved of his duties as evidence custodian. Therefore, in February 2011, when Chief Sturm maintained that Major Robinson still had not done as directed and had not facilitated the transfer of the evidence, these officers agreed that Major Robinson was no longer in charge of the evidence room, having been relieved of this duty in December 2010. Major Robinson testified he did not even have the authority to make the requisite purchases to have the new location set up and functioning.

There was also testimony regarding the steps Major Robinson had taken in furtherance of transferring his duties to Officer Abrams and his communicating thereof with Chief Sturm. He explained that he was not able to have the necessary alarm installed due to the Mardi Gras holiday, which he let Chief Sturm know. He also advised, and Chief Sturm was aware of the fact that a temporary two-party system had been implemented.

Major Robinson argues that contrary to what had actually transpired, on March 1, 2011, Chief Sturm authored a disingenuous letter to Major Robinson constituting a written reprimand for the deplorable condition of the evidence room, for moving evidence prior to the performance of the audit, for disobeying a direct order to begin the auditing process on February 21, 2011, for keeping his office door locked, and for jeopardizing the integrity of the department. Continuing thereafter, on March 15, 2011, Chief Sturm wrote to the Vice President of Student Affairs, Dean Edward Pratt, requesting a five-day suspension of Major Robinson, citing his failure to follow through on the orders given to him relative to the evidence room in December 2010 and repeated in March 2011. Notably, all of this occurred before Major Robinson signed his intended retirement papers on May 9, 2011.

Major Robinson also points to the internal investigation which was instituted in May 2011 at the direction of Chief Sturm. This investigation centered around

Major Robinson being in possession of evidence in his office after being relieved of his duties as evidence custodian and for an item of evidence that was allegedly missing when an empty cell phone box was found in Major Robinson's office. Sergeant Abrams, having taken over the duties of evidence custodian, reported the empty box to Chief Sturm. Chief Sturm directed Lieutenant Louviere to conduct a Level I internal affairs investigation. After beginning the investigation, Lieutenant Louviere remembered that he and Major Robinson had previously returned the cell phone to its owner. Major Robinson denied that he executed the necessary property release form, although it contained his name. Although the iPhone was accounted for, Lieutenant Louviere's investigation resulted in a finding of malfeasance and insubordination based on Major Robinson still having evidence in his office. According to Major Robinson, some of the items which remained in his office were simply unclaimed property. The internal investigation, in his view, was simply another opportunity to "paper" his file.

The final action taken by Chief Sturm, which was the reassignment of Major Robinson to the primate center in New Iberia, was also the subject of trial testimony. ULL minimizes the relevance of this action since it was taken after Major Robinson signed the paperwork indicating his retirement in July 2011; however, Major Robinson avers that he could have changed his mind and not gone forward with his retirement. He further contends that this reassignment resulted in yet another reprimand, which he felt was unwarranted.

Chief Sturm's testimony relative to the primate center was clearly contradicted by the testimony of the other officers, including Lieutenant Broussard, Officer Mendoza, and Sergeant Johnson. Chief Sturm testified that Major Robinson's transfer to the primate center was due to the need for an administrative position there, and further, that the transfer was not intended as a punishment to

Major Robinson. Undeniably, Major Robinson did not suffer a reduction in pay as a result of the reassignment, but the other officers' testimonies consistently described the assignment as undesirable. The officers all confirmed that the only individuals who were assigned to the primate center were those that lived in the New Iberia area or those that were being "punished."

For all practical purposes, Major Robinson's new assignment, which was thirty miles away, put him back in the position of a patrolman. Major Robinson and the other members of the ULLPD perceived this as a demotion. In this newly assigned and lesser position, Major Robinson was given an older vehicle for his transportation to and from New Iberia; and, the new patrol vehicle, which he was using prior thereto, was given to Lieutenant Zerangue, who was permitted full use of the vehicle.

ULL has maintained that if there was any adverse employment action taken against Major Robinson, it was done, not because of his age, but rather as a result of his insubordination. In closely scrutinizing the record of this trial by jury, we find it significant that in order to prove his claim of age discrimination, apart from his own testimony, Major Robinson had to rely upon only employees of the ULLPD. As concluded by the court of appeal, "[a]fter viewing the record in its entirety, we find that the jury had conflicting evidence before it and apparently did not find credible defendant's explanation that Robinson voluntarily retired or that any adverse employment action taken against him was due to his insubordination." *Robinson*, 208 So.3d at 522. In this case, the jury found that ULL's actions were unlawfully motivated. For the foregoing reasons, we find that a reasonable factual basis for the jury's findings exists, and the record does not demonstrate that the jury's findings were clearly wrong or manifestly erroneous.

**Damages**

ULL argues that the jury's verdict of $367,918.00 was excessive. We agree, finding that the jury's award is not supported by the evidence in the record.

Major Robinson sought damages for lost wages due to his constructive discharge in July 2011. It was his testimony that had he not been subjected to age-based discrimination, it was his intention to work for the ULLPD for three more years. Further, Major Robinson testified that at the time of his retirement, he was earning $69,000.00 annually. Consistent with this testimony, in closing arguments, plaintiff's counsel reiterated his demand for three years lost wages.

The manner in which the jury arrived at the damage award of $367,918.00 is not discernable from the record. Lost wages was the sole element of damages for which testimony or other evidence was presented to the jury. There was no general damage award sought by Major Robinson, and no such jury instruction was provided to the jury. The First Circuit Court of Appeal affirmed the award, but failed to provide any discussion in support thereof in the majority opinion.

It is apparent from the record that the only evidence presented on damages was the element of lost wages. Given Major Robinson's testimony of an annual salary of $69,000.00, and considering his intention to remain employed for an additional three years, the amount of the award supported by the evidence in the record is $207,000.00, representing three years of wages at $69,000.00 a year, and nothing more. Because we conclude that Major Robinson prevailed on his age discrimination claim, we affirm the judgment below as to liability and amend the damage award as set forth above.

### DECREE

For the reasons set forth above, we affirm the jury's finding of age discrimination in favor of plaintiff, James Robinson. However, we find that the jury's damage award of $367,918.00 is not supported by the record; therefore, we

23

amend the jury's damage award to $207,000.00, and affirm the award as amended. Costs are assessed seventy-five percent to defendant, the Board of Supervisors for the University of Louisiana System, and twenty-five percent to plaintiff, James Robinson.

**AFFIRMED AS AMENDED.**

# SUPREME COURT OF LOUISIANA

## NO. 2016-C-2145

## JAMES ROBINSON

## VERSUS

## THE BOARD OF SUPERVISORS FOR THE UNIVERSITY OF LOUISIANA SYSTEM AND JOEY STRUM, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE FOR THE UNIVERSITY OF LOUISIANA AT LAFAYETTE

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF EAST BATON ROUGE*

**WEIMER, J.**, dissenting.

I very respectfully dissent for the reasons assigned by the dissenting judge in the appellate court. Among the most notable reasons is the plaintiff failed to prove age-based comments were attributed to decision-makers, whose actions led to plaintiff's constructive discharge. The age-based comments plaintiff presented at trial were made by police officers who were lower ranking than the plaintiff. The plaintiff failed to show that the lower-ranking officers were decision-makers for any of the adverse employment actions plaintiff claimed occurred. See **Hazen Paper Co. v. Biggins**, 507 U.S. 604, 610 (1993) ("In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.")

The uncontroverted evidence regarding decision-making authority established that the police chief held and exercised such authority. The police chief assigned plaintiff's duties, cited plaintiff for insubordination, imposed a suspension for the insubordination, and rescinded the suspension when the plaintiff declared his intent to retire.

The plaintiff had the burden at trial to "prove that age was the 'but-for' cause of the employer's adverse decision." **Gross v. FBL Fin. Servs., Inc.**, 557 U.S. 167, 176 (2009). Plaintiff failed to carry this burden. There was no evidence by which the jury could find an age-based motivation for the police chief's actions, which is why the plaintiff attempted–unsuccessfully–to equate plaintiff's subordinates as his superiors for the purposes of the employment actions taken prior to plaintiff's announced plan to retire. For the period of time after the plaintiff's retirement announcement, plaintiff failed to demonstrate the existence of any actionable, adverse employment action that might rise to the level of forcing his hand into a constructive discharge. Even assuming plaintiff's post-retirement announcement assignment to a brief patrol duty at a university research center constituted an adverse employment action, plaintiff failed to demonstrate age-based animus. Instead of the change of duties being grounded in age discrimination, the record evidence demonstrates that, after plaintiff's announcement, the police chief changed plaintiff's duties to facilitate transitioning the department to function after the plaintiff's actual retirement.