GREGORY JACKSON

VERSUS

DARRYL A. SUMLIN

NO. 23-CA-329

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 68,421, DIVISION "D"
HONORABLE M. LAUREN LEMMON, JUDGE PRESIDING

April 10, 2024

**STEPHEN J. WINDHORST**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, and Stephen J. Windhorst

**<u>AFFIRMED</u>**
    **SJW**
    **FHW**
    **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
DARRYL A. SUMLIN
    Ralphael Bickham

COUNSEL FOR PLAINTIFF/APPELLEE,
GREGORY JACKSON
    George R. Ketry, Jr.

**WINDHORST, J.**

Appellant/defendant, Darryl Sumlin, seeks review of (1) the trial court's November 9, 2015 partial judgment in favor of appellee/plaintiff, Gregory Jackson, annulling and setting aside an Act of Donation of Property from Mr. Jackson to Mr. Sumlin, dated April 5, 2004; (2) the trial court's November 9, 2015 partial judgment dismissing as moot Mr. Sumlin's exception of prescription; and (3) the trial court's March 3, 2023 judgment denying Mr. Sumlin's reconventional demand, finding the value of the improvements to be zero.[1] For the reasons stated herein, we affirm.

**PROCEDURAL HISTORY**

On October 27, 2008, Mr. Jackson filed suit seeking to annul and set aside an Act of Donation of Property ("the donation") from Mr. Jackson to Mr. Sumlin, executed before Victor E. Bradley, Jr. on April 5, 2004, and recorded at COB 634, folio 404 of the records of the Clerk of Court of Parish of St. Charles, Louisiana, affecting immovable property described therein as Lots 51, 52, 53, and 54 of Square 2, St. Charles Terrace Annex Subdivision.[2] Included within the donation as "improvements" were: (a) a 1971 Coventry 12' x 52' mobile home; (b) a 10' x 50' mobile home; (c) a 12' x 16' storage shed; and (d) all furniture, air conditioners and contents in the mobile homes. Mr. Jackson alleged two theories for annulling, rescinding and setting aside the April 5, 2004 donation, specifically: (1) the donation should be annulled due to the ingratitude of Mr. Sumlin (*i.e.*, eviction of Mr. Jackson in April of 2007); and/or (2) the donation is null and void and in violation of La. C.C. art. 1498 because the donation divested Mr. Jackson of his entire patrimony without reserving to himself enough for his subsistence.[3]

---

[1] Pursuant to this court's order, the trial court submitted an amended judgment, signed February 29, 2024, containing the appropriate decretal language.

[2] Mr. Sumlin subsequently re-subdivided the property by combining the four lots.

[3] Mr. Jackson filed an amended petition on July 22, 2010, which did not change the substance of his allegations.

In response, Mr. Sumlin filed an answer and reconventional demand against Mr. Jackson seeking to recover the value of improvements on the property, allegedly in excess of $200,000.00, in the event the donation is annulled.

Mr. Sumlin also filed an exception of prescription alleging Mr. Jackson's claim of ingratitude under La. C.C. art. 1557 was prescribed because Mr. Jackson's lawsuit was filed more than a year after the alleged act of ingratitude (*i.e.*, Jackson's eviction in April 2007). Mr. Jackson filed an opposition arguing the claim of ingratitude was an alternative theory of the case in the event the donation was not an absolute nullity under La. C.C. art. 1498.

On September 15, 2015, a bench trial was held on Mr. Jackson's main demand and Mr. Sumlin's reconventional demand. On November 9, 2015, the trial court: (1) rendered judgment in favor of Mr. Jackson, annulling and setting aside the donation as a violation of La. C.C. art. 1498; (2) dismissed as moot Mr. Sumlin's exception of prescription; (3) severed Mr. Sumlin's reconventional demand; (4) ordered Mr. Jackson to file post-annulment claims, if he had any, and ordered Mr. Sumlin to amend his reconventional demand, as may be appropriate; and (5) set a status conference to determine a date for trial on the "parties' respective claims post-annulment."

Mr. Sumlin suspensively appealed the November 9, 2015 judgment and this court dismissed the appeal without prejudice. This court found the judgment was not a final judgment because it did not dispose of Mr. Sumlin's reconventional demand nor was the partial judgment designated as a final and appealable judgment under La. C.C.P. art. 1915 B by the trial court.

Mr. Sumlin subsequently amended his reconventional demand, alleging he was in good faith possession of the property, and that he used his own funds totaling

$28,777.38[4] to make improvements to the property prior to Mr. Jackson's eviction in April of 2007, and for the cleanup costs after the August 20, 2017 fire that destroyed the property. He reiterated his prayer in the original reconventional demand, and alternatively, he asserted that he is entitled to judgment in the amount of $50,000 for the value of the improvements and his "sweat" equity. In response, Mr. Jackson maintained that Mr. Sumlin was in bad faith possession of the property and Mr. Sumlin had remained in possession of the property from 2015 to the fire in 2017, despite the trial court's November 9, 2015 judgment annulling the donation.

After several continuances, Mr. Sumlin's reconventional demand was reset for a bench trial on September 13, 2022. On the day of the trial, the trial court heard Mr. Jackson's motion *in limine* to exclude Mr. Sumlin's expert's reports regarding valuation of the property. Mr. Jackson's counsel argued the reports were only generic estimates of what it would cost to build a house at the time the reports were generated; they were not specific to the alleged improvements made by Mr. Sumlin on the property. Mr. Jackson's counsel asserted that Mr. Sumlin's expert was not an appraiser, he did not inspect the property, and he did not indicate what materials Mr. Sumlin actually used for the improvements. Mr. Jackson's counsel stated the expert did not perform any of the work on the property and could not testify as to what work was performed. Therefore, counsel for Mr. Jackson argued the expert's reports should not be admitted into evidence. Mr. Sumlin's counsel argued his expert was an expert in construction and would testify as to the value of the improvements prior to and after Mr. Jackson's eviction. The trial court granted the motion and excluded Mr. Sumlin's expert's reports.

Thereafter, trial commenced on Mr. Sumlin's reconventional demand. After testifying about Mr. Jackson's 2004 donation of the property to him, Mr. Sumlin

---

[4] The amended petition referred to "Exhibit A," which referenced exhibits identified in the 2015 trial and the corresponding amounts allegedly owed to Mr. Sumlin from Mr. Jackson for improvements on the property.

began to testify as to the improvements he had made to the property. Mr. Sumlin's counsel showed Mr. Sumlin a "package of materials" and asked him to verify if the entire package represented Mr. Sumlin's out-of-pocket expenses for improvements made to the property. Mr. Jackson's counsel objected. The trial court instructed Mr. Sumlin's counsel to separate the pre-eviction receipts from the post-eviction receipts. As a result, the trial court briefly recessed the trial for the parties to confer and to comply with its instructions.

After conferring, the parties jointly informed the trial court that additional time was needed and a continuance of the trial was necessary. On the record, the parties agreed (1) to reset the trial to another date to allow Mr. Sumlin's counsel time to gather his pre-eviction expenditure evidence; and (2) Mr. Sumlin's counsel could proffer his expert's reports "at the next hearing date." The trial court thereafter continued the trial, resetting it for November 16, 2022. The trial court also ordered the parties to provide an itemized list of all documents they intended to introduce ten days in advance of trial. Mr. Sumlin's counsel also informed the trial court that Mr. Sumlin would testify and produce all relevant receipts at the next trial date.

On November 16, 2022, a bench conference was held prior to the start of the trial, after which Mr. Sumlin's counsel sated on the record the parties' "agreement." Mr. Sumlin's counsel stated the parties agreed to brief "the issues" as to La. C.C. art. 496 "possessor in good faith," the values of the property improvements, and the dates that apply to those values because the "structures" built by Mr. Sumlin were destroyed in a 2017 fire, and thus, no longer existed. As to the value of the improvements on the property, Mr. Sumlin's counsel asserted that the "question is whether or not Mr. Sumlin is entitled to the value as of the time of the judgment or . . . whether he can only get current value." The trial court responded, "[i]f it's current value, it's zero," to which neither counsel objected. No further testimony or evidence was provided and/or admitted and Mr. Sumlin's counsel did not proffer his

expert's reports on this or any other date in this proceeding. The trial was again continued and reset for March 3, 2023.[5]

At the March 3, 2023 bench trial, again, no witnesses testified and no exhibits were admitted into evidence. The trial court heard only arguments of counsel addressing the various issues previously raised relative to the reconventional demand.

Mr. Jackson's counsel argued that under La. C.C. art. 496, Mr. Jackson as the owner of the property, at his option, is entitled to select which valuation to use to compensate Mr. Sumlin, should the trial court find Mr. Sumlin was in good faith at any time, which Mr. Jackson denied. Mr. Jackson's counsel asserted that under any of the alternative La. C.C. art. 496 valuations (*i.e.*, costs and materials; current value; or enhanced value), the value is zero because the property was destroyed by fire while in Mr. Sumlin's possession. He argued that La. C.C. art. 496 applies to a good faith "possessor," not ownership, and Mr. Sumlin was not in good faith after the November 2015 judgment, and was in bad faith at earliest in 2007, when he evicted Mr. Jackson. Mr. Jackson's counsel contended that the purpose of La. C.C. art. 496 was "to prevent someone from getting a windfall . . . ," and Mr. Jackson did not receive a windfall because the property was destroyed by a fire while still in Mr. Sumlin's possession. Mr. Jackson's counsel further asserted that at the time of the 2017 fire, which was 10 years after Mr. Jackson's eviction in 2007, the alleged improvements were not fully constructed and/or completed.

Thus, Mr. Jackson's counsel argued Mr. Sumlin's possession of the property terminated, at the earliest, on the date of the fire, because Mr. Sumlin was still in possession of the property at the time of the fire in 2017, despite the trial court's November 9, 2015 judgment annulling the donation. Assuming good faith

---

[5] Prior to the March 3, 2023 bench trial, the parties filed briefs pursuant to the agreement set forth on November 16, 2022.

possession, Mr. Jackson's counsel argued the valuation date for the value of the improvements on the property should be the date of the trial (*i.e.*, 2023) or the date of the fire in 2017, when Mr. Sumlin's possession terminated. Mr. Jackson's counsel further averred that Mr. Sumlin was not in good faith in 2015, and was in bad faith at least in 2007 when he evicted Mr. Jackson, arguing Mr. Sumlin could only be in good faith prior to Mr. Jackson's eviction. Mr. Jackson's counsel argued that after the fire, "there was zero value, zero enhanced value, and just no current value." Counsel for Mr. Jackson "submit[ted] . . .on the briefs as to the value."

Mr. Sumlin's counsel conceded that Mr. Sumlin had control of the property at the time of the fire, but argued that Mr. Sumlin did not own the property or have an insurable interest at the time of the fire because of the trial court's prior judgment annulling the donation. Mr. Sumlin's counsel argued that Mr. Jackson could have and should have started eviction proceedings against Mr. Sumlin, and Mr. Jackson should have insured the property, but he chose not to do so. Mr. Sumlin's counsel agreed the determination of the value of the improvements on the property should be at the time of trial, but argued that the parties already had the trial in 2015, when the donation was annulled. Therefore, he asserted that the value of the improvements should be determined as of 2015, when title to the property was transferred back to Mr. Jackson. Mr. Sumlin's counsel argued that under La. C.C. art. 496, which the trial court had previously ruled applied because Mr. Sumlin was a good faith possessor, Mr. Jackson as the owner was bound to pay him either the cost of the materials and of the workmanship, the current value, or the enhanced value. Mr. Sumlin's counsel asserted that it was "manifestly unfair to put a 2023 value on property that was taken from Mr. Sumlin, . . . who was in good faith in 2015[.]"

Thereafter, at the conclusion of counsels' arguments, the trial court denied Mr. Sumlin's reconventional demand, finding that "pursuant to the clear language of Article 496, . . . whether the value was in 2017 or today, the value was zero[.]"

**FACTS and EVIDENCE**

Mr. Jackson testified he bought the property located at 181 Clement Street, in New Sarpy, in 1989 and from 1989-2004, he owned and lived on the property continuously. During that period, his residence had utilities (*i.e.*, electricity, water, and gas). Mr. Jackson testified he had "two trailers and a house in the middle"[6] on the property. He acknowledged that at one point during his ownership of the property, he "had an old car" and "some wood" in his yard, the parish gave him a notice, and the parish ultimately "cleaned the property" because "time ran out."

Mr. Jackson testified his brother, Walter,[7] informed him that his son, Mr. Sumlin, needed a place to stay. At that time, Mr. Sumlin was in his 20s and was recently released from jail. Mr. Jackson stated it was not uncommon for him to allow people to live in his trailers at no charge. Mr. Jackson asserted Mr. Sumlin was trying to get back on his feet, and he gave Mr. Sumlin "a helping hand" by allowing him to stay in one of his trailers on the property. Mr. Jackson avers his relationship with Mr. Sumlin was as "nephew and uncle," and Mr. Sumlin agreed to "work around the place," and fix his trailer (*i.e.*, install a new roof and add a room to his trailer) in exchange for staying on his property.

Mr. Jackson testified the trailer Mr. Sumlin moved into did not have electricity, but it had water and gas because the water and gas were on a "combined line" that also went to his trailer. Mr. Jackson testified his trailer had utilities at the time Mr. Sumlin moved into the other trailer. Mr. Jackson testified he was able to pay his utilities by "working on cars." He testified he paid his bills from money received "working on cars," which was his only occupation, and he worked on the cars in the front of the property.

---

[6] Based on evidence, the "house in the middle" appears to refer to the "shed" included in the donation to Mr. Sumlin.

[7] Mr. Jackson testified that his brother is deceased.

Mr. Jackson acknowledged he signed the donation in 2004, donating all of his property to Mr. Sumlin. Mr. Jackson stated he remembered going to a lawyer's office, but did not know which lawyer's office. Mr. Jackson claimed that the day of trial was the first-time he ever saw Victor Bradley,[8] the attorney who notarized the donation. He stated Mr. Sumlin took him to the lawyer's office. When he walked in, the secretary placed a piece of paper in front of him, and he "just . . . signed it." Mr. Jackson asserted Mr. Sumlin told him that "the papers" were for Mr. Sumlin to have power of attorney over him. Mr. Jackson testified he was getting money from "the community" (*i.e.*, the Valero funds), but he was on "drugs and intoxicated, that's why I gave [Mr. Sumlin] power of attorney to use money to remodel my trailer." Mr. Jackson also testified he did not have an agreement with Mr. Sumlin that would allow him to live on the property until his death after the donation.

Mr. Jackson testified after the donation, he opened a joint account, containing $13,503.93, at Hibernia National Bank with Mr. Sumlin on October 17, 2005. Mr. Jackson stated he deposited all of the checks he received from FEMA for damage to his trailer from Hurricane Katrina into the joint account.[9] Mr. Jackson admitted he also received $1,500, every six months, from Valero Refinery to rehabilitate his property. Mr. Jackson testified he did not know when he initially started receiving those funds nor when he received the last payment, but he stated he received the funds for five years. He asserted the Valero funds were deposited in the joint checking account with Mr. Sumlin. Mr. Jackson testified he did not have any other bank accounts besides the joint account with Mr. Sumlin at Hibernia. He stated Mr.

---

[8] Victor Bradley testified Mr. Jackson and Mr. Sumlin appeared before him on April 5, 2004, and executed the donation. Mr. Jackson said he wanted to donate his property to Mr. Sumlin. Mr. Bradley asserted he explained to Mr. Jackson that by executing the donation, he would no longer own the property and Mr. Jackson agreed. Mr. Bradley asserted that Mr. Jackson did not ask any further questions and did not state why he was donating the property. Mr. Bradley testified there was no mention of Mr. Jackson being able to stay on the property.

[9] The FEMA checks he received were in the amounts of $2,000 (dated September 17, 2005), $13,003.93 (dated October 9, 2005), and $8,692.11 (dated February 1, 2006). Mr. Jackson verified the check for $13,003.93 was for personal property, rental assistance, and replacement housing, but admitted he did not use the money to buy another trailer. Mr. Jackson testified he made a claim with FEMA because he believed he owned the trailer.

Sumlin had unrestricted access to all of his money (*i.e.*, FEMA and Valero funds) in the joint account. Mr. Jackson maintained that he only deposited money into the joint account, and that when he wanted to withdrawal money, it was gone.

Mr. Jackson testified he did not realize he had given ownership of his property to Mr. Sumlin until he was forcibly evicted by Mr. Sumlin from the property in April of 2007.[10] Mr. Jackson stated he called the police to prevent his eviction. The police informed him there was nothing they could do to stop the eviction after Mr. Sumlin showed them the donation. Mr. Jackson testified he gathered his belongings, went down the road, and stayed in an abandoned house that did not have any utilities. Shortly thereafter, his niece Felechi Jackson,[11] picked him up and brought him to live with her and her four children in a two-bedroom trailer.

Mr. Jackson testified he struggled with a substance abuse problem for 20 years but was currently sober at that time. He stated his niece assisted him with his substance abuse issues. Mr. Jackson testified his niece had power of attorney over him, and she helped him obtain the government assistance he was currently receiving, and she provided everything for him, including shelter, food and clothing.

Mr. Jackson testified Mr. Sumlin did not make any improvements on the property prior to 2007. He stated Mr. Sumlin ultimately tore down both trailers and built a two-story building on the property. Mr. Jackson asserted that "[t]he thing he did built [*sic*] for me to live on the property, I already left. He already kicked me off." He stated Mr. Sumlin did not do any work on the property that benefitted him.

---

[10] Mr. Jackson testified he was intoxicated and laying in his driveway. Mr. Sumlin kicked him, told him to get up, and that he had to leave the property. Mr. Jackson testified Mr. Sumlin shoved him when he got up to leave. Mr. Jackson asserted Mr. Sumlin ran behind him, hit him in the back, and punched him when he was walking/staggering away.

[11] Ms. Jackson testified that Mr. Jackson is her uncle. When she learned of his eviction, she picked him up at an abandoned house in April of 2007, and brought him to live with her and her four children. She testified that it was her intention was to get her uncle some help and she provided him with whatever he needs. Mr. Jackson has lived with her continuously since 2007. She testified she has not had any interactions with Mr. Sumlin.

Mr. Sumlin testified he moved onto Mr. Jackson's property in 2002.[12]  He stated he had just been released from jail and was "going through some things," and Mr. Jackson, his uncle, had a "situation" involving his property and the parish when he moved onto the property.  Mr. Sumlin testified that he is not related to Mr. Jackson "by blood," and Mr. Jackson's brother, "Clarence,"[13] was his stepdad, not his biological father.  Mr. Sumlin said his stepdad told him that his brother needed help and he could help Mr. Jackson because of "his skills."  Mr. Sumlin testified he told Mr. Jackson, "In order for me to make a change with, with this property, you have to change yourself, and I [have] to change my environment."  Mr. Sumlin also asserted that Mr. Jackson was getting harassed by drug dealers, and he was tired of them beating up his uncle and "leaving him on the tracks for dead."  Mr. Sumlin stated he did not want others to take advantage of Mr. Jackson.

Mr. Sumlin testified that Mr. Jackson allowed him to live in one of his trailers (*i.e.*, the brown and white trailer) and he did not have to pay rent.  Mr. Sumlin stated he occupied and owned the brown and white trailer prior to the donation, even though it was still in Mr. Jackson's name.  He "owned the trailer because [he] had lights and gas and water on it."  He asserted Mr. Jackson did not have utilities on the property in 2002; he had to "reroute all" the lines.

Mr. Sumlin testified that Mr. Jackson would be on the property begging for a job.  He stated that Mr. Jackson would stop people or flag them down so he could perform work on their cars.  He acknowledged that Mr. Jackson worked on cars on the property.  He testified Mr. Jackson received money from those jobs, although he "wouldn't call it income."  Mr. Sumlin averred that all he wanted to do with the money was "get drugs or beer with it."  When asked how much money Mr. Jackson received for working on cars, Mr. Sumlin replied, "$10, $20."  Additionally, when

---

[12] Mr. Sumlin also testified at different times, he moved onto the property in 2003.

[13] Mr. Jackson testified that his brother's name was Walter, not Clarence.  Mr. Sumlin testified his mother had a "relationship" with Mr. Jackson's brother.

asked if Mr. Jackson did get any jobs, Mr. Sumlin stated, "If that's what you want to call it, sir." Mr. Sumlin asserted that Mr. Jackson did not do anything "but sit down all day long and stop people in front of my driveway and beg for money and beg for jobs," while he worked. Mr. Sumlin further testified he had a job and paid for everything.

Mr. Sumlin testified that in 2004, he went to Mr. Bradley's office with Mr. Jackson and a description of the property to prepare and execute the donation. Mr. Sumlin said that the donation was signed the same day and he immediately started to rehabilitate the property. However, at other times in his testimony, Mr. Sumlin testified inconsistently that he started making improvements on the property prior to the donation.

Mr. Sumlin admitted he shared a joint account with Mr. Jackson but asserted he did not use any of Mr. Jackson's money to make the improvements. Mr. Sumlin testified that 100% of the FEMA money deposited in the joint account by Mr. Jackson was spent on items for Mr. Jackson, despite the fact that Mr. Jackson had received FEMA money for a trailer he no longer owned. Mr. Sumlin testified he used the money to purchase "Wood. Toilets. Vanities. Clothes. Food. Paying [*sic*] insurance"[14] for Mr. Jackson. Mr. Sumlin stated he also received FEMA money and placed it in the joint account with Mr. Jackson, which Mr. Jackson had access. Mr. Sumlin then reiterated he spent the money in the joint account solely for items for Mr. Jackson.

Mr. Sumlin also admitted that Mr. Jackson started giving him "some" of the Valero funds he received, once he realized what Mr. Jackson "was doing with his share of the money." Mr. Sumlin averred he took "whatever" money Mr. Jackson gave him. Mr. Sumlin asserted he was paying the bills, the utilities were in his name,

---

[14] Mr. Sumlin testified that he bought Mr. Jackson a life insurance policy because he needed one and he "was afraid that someone would hurt [Mr. Jackson]" due to his "drug habit."

and the Valero "money was supposed to come to [him]" because it was his trailer at the time Mr. Jackson received the Valero funds. Mr. Sumlin testified that Mr. Jackson did not have utilities moved onto the property and he was not entitled to the funds from Valero. Mr. Sumlin then testified that he used the Valero money he received from Mr. Jackson only to purchase items for Mr. Jackson because he used his own money and a $25,000 credit from Home Depot for the improvements.

Mr. Sumlin stated that the "real reason [Mr. Jackson] was evicted is because he was getting his money from Valero, cash money, and he got a sexual predator in my home." Mr. Sumlin asserted that Mr. Jackson and the sexual predator were both naked in the home, they had drugs and money, and he could not take it anymore. Mr. Sumlin stated he covered his daughter's eyes and told Mr. Jackson to leave.

Mr. Sumlin later contended "[a]s far as the eviction, all [Mr. Jackson] had to do was come back the next week and say he's sorry and stop doing what he was doing. Why he want [sic] to take counseling and all of that that [sic] he say after I evict him, when he could of just did [sic] it during the time that he was staying with me. I don't understand all of that."

Mr. Sumlin testified he made improvements to the property from 2002 to 2015, prior to and after the donation in 2004 and after Mr. Jackson's eviction in 2007. Mr. Sumlin admitted he did not have any evidence to show the condition of the property prior to the donation, after the donation, or after Mr. Jackson's eviction. He acknowledged he only had photographs of the property taken a year before the trial in 2015. Mr. Sumlin testified he attempted to fix his trailer and started to build "around it," but ultimately had to tear it down, and he built a two-story home and shed on the property.

Mr. Sumlin asserted he spent $10,300.97 for the repair of the home and he spent additional amounts of $4,383.26, $4,145.58, and $10,060 for construction materials. He also testified that he spent money on obtaining permits from St.

Charles Parish for (1) construction on the trailer; (2) construction on the two-story house; and (3) construction on the shed. Mr. Sumlin admitted he salvaged some material from his trailer for the improvements on the property. Mr. Sumlin stated that as of the date of the 2015 trial, the trailers were torn down, but conceded the two-story house and shed were still not finished. Mr. Sumlin asserted he was still improving the property on the date of the 2015 trial and blamed this case for the delayed progress.

Mr. Sumlin's testimony was confusing, inconsistent and contradictory as to what improvements were made, when the improvements were made, and the value of the improvements.[15] Mr. Sumlin identified and referred to numerous exhibits to support his improvements, including receipts; however, the exhibits were ultimately not offered and admitted into evidence.

**LAW and ANALYSIS**

On appeal, Mr. Sumlin asserts the trial court erred (1) in determining that the donor, Mr. Jackson, was destitute at the time of the donation; (2) in failing to rule that the allegations of ingratitude were insufficient and that the action was prescribed; and (3) denying his reconventional demand and determining that the value of the improvements now owned by Mr. Jackson is zero, instead of determining the value of the improvements as of the trial court's ruling on November 9, 2015.

A trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review unless they are manifestly erroneous or clearly wrong. Wooley v. Lucksinger, 09-571 (La. 04/01/11), 61 So.3d 507; Rosell v. ESCO, 549 So.2d 840 (La. 1989). When findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great

---

[15] Numerous times throughout his testimony, the trial court interrupted Mr. Sumlin's testimony to ask him questions about his inconsistent, contradictory, and confusing statements in an attempt to clarify or understand Mr. Sumlin's testimony.

deference to the trial court's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. <u>Robinson v. Board of Supervisors for University of Louisiana System</u>, 16-2145 (La. 06/29/17), 225 So.3d 424, 430, *citing* <u>Rosell</u>, 549 So.2d at 844-845.

The trial court's factual findings under the manifest error standard can only be reversed if the appellate court finds, based on the entire record, no reasonable factual basis for the factual finding and the fact finder is clearly wrong. <u>Baker v. PHC-Minden, L.P.</u>, 14-2243 (La. 05/05/15), 167 So.3d 528, 538. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable trier of fact would not credit the witness's story, then the appellate court may find the trier of fact was manifestly erroneous even when a finding of fact is purportedly based on a credibility determination. <u>Robinson</u>, 225 So.3d at 430. But where no such factors are present, and the fact finder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. <u>Id.</u>; <u>Bellard v. American Central Insurance Co.</u>, 07-1335 (La. 04/18/08), 980 So.2d 654, 672.

**Donation *Inter Vivos* of Entire Patrimony and Prescription**

In his first and second assignments of error, Mr. Sumlin contends the trial court was manifestly erroneous in finding Mr. Jackson proved he was destitute at the time of the donation, and the trial court erred in finding Mr. Jackson's claim of ingratitude was timely.

Specifically, Mr. Sumlin's counsel argues there was no testimony about Mr. Jackson's financial condition as of the date of the donation. Instead, the testimony focused on Mr. Jackson's financial condition after he was evicted from the property.

Mr. Sumlin's counsel also argues the trial court erred in finding Mr. Jackson's claim of ingratitude was timely. He contends the trial court incorrectly found the claim was timely because the alleged act of ingratitude (*i.e.*, the 2007 eviction) continued beyond the eviction date.

A donation *inter vivos* shall in no case divest the donor of all his property; he must reserve to himself enough for subsistence.[16] La. C.C. art. 1498. A determination as to whether the donor reserved enough property for his subsistence must be made from the circumstances existing at the time the donation was made. Madden v. Crawford, 52,466 (La. App. 2 Cir. 02/27/19), 265 So.3d 1170, 1175; Manicha v. Mahoney, 10-87 (La. App. 4 Cir. 08/04/10), 45 So.3d 618, 622, writ denied, 10-2259 (La. 11/24/10), 50 So.3d 829; LeBourgeois v. Yeutter, 88-661 (La. App. 3 Cir. 10/04/89), 550 So.2d 314, 315-316, *citing* Succession of Quaglino, 95 So.2d 481, 487 (La. 1957). In order to successfully challenge such a donation, generally the plaintiff must prove conclusively that the donation divested the donor of all of his property. Manichia, 45 So.3d at 622; Owen v. Owen, 336 So.2d 782, 786 (La. 1976). The current or future financial and property status of a donor is not at issue when determining whether a donor reserved enough property for his own subsistence. Madden, 265 So.3d at 1175; Manichia, 45 So.3d at 622.

The party seeking to nullify a donation pursuant to La. C.C. art. 1498 has the burden of proving that the donation divested the donor of all of his property and the donor did not reserve enough for his subsistence. Madden, 265 So.3d at 1175; Tatum v. Riley, 49,670 (La. App. 2 Cir. 05/06/15), 166 So.3d 380, 385.

In this case, Mr. Jackson testified he did not own any other property at the time of the donation to Mr. Sumlin. This fact was not disputed by Mr. Sumlin. Mr. Jackson's "occupation" or "job" was "working on cars" at the time of the donation.

---

[16] This is also referred to as a donation *omnium bonorum* ("of all goods").

Mr. Jackson testified that while he owned the property from 1989 to 2004, he worked on cars in the front yard of his property, that "working on cars" was his only occupation, and that he paid his bills with the money he received from working on cars. Mr. Jackson further testified the only bank account he had was the joint account he opened with Mr. Sumlin in October of 2005. Mr. Sumlin acknowledged that Mr. Jackson worked on cars on the property and remarked that "working on cars" was not a "job" and he "wouldn't call it income." Mr. Sumlin testified that Mr. Jackson only received "$10, $20" for those "jobs," and that he, Mr. Sumlin, was the only one that had a job and paid for everything.

Considering the evidence, the trial court made reasonable credibility determinations and reasonable inferences of fact that Mr. Jackson donated all of property to Mr. Sumlin without reserving enough for his own subsistence. We conclude the trial court was neither manifestly erroneous nor clearly wrong in finding the donation to be in violation of La. C.C. art. 1498, and thus, an absolute nullity. Therefore, the trial court properly annulled and set aside the donation. We find this assignment of error to be without merit.

An *inter vivos* donation that divests the donor of all his property without reserving to himself enough for subsistence is an absolute nullity, and therefore, is imprescriptible. Trahan v. Bertrand, 06-1271 (La. App. 3 Cir. 02/21/07), 952 So.2d 809, 812, writ denied, 07-631 (La. 05/04/07), 956 So.2d 612; Givens v. Givens, 273 So.2d 862, 865 (La. App. 2 Cir. 1973), writ refused, 275 So.2d 868 (1973); See also La. C.C. art. 7.[17] The public policy behind this statute is to prevent a donor from divesting himself of all of his property such that he becomes a ward of the state. Trahan, 952 So.2d at 812.

---

[17] La. C.C. art. 7 states:

> Persons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity.

In his petition, Mr. Jackson alleged two theories for annulling, rescinding and setting aside the April 5, 2004 donation: (1) ingratitude; or (2) donation of his entire patrimony without reserving enough for his subsistence in violation of La. C.C. art. 1498. Mr. Sumlin's exception of prescription only addressed Mr. Jackson's claim of ingratitude, alleging it was prescribed because the suit was filed more than one year (October 2008) after the alleged act of ingratitude (*i.e.*, the eviction in April of 2007).

In its November 9, 2015 judgment, the trial court dismissed Mr. Sumlin's exception of prescription as moot. The trial court found there was "no need" to rule on Mr. Sumlin's exception of prescription as to Mr. Jackson's claim of ingratitude because the donation was annulled under the provisions of La. C.C. art. 1498.[18] We agree. As an absolute nullity, the donation was imprescriptible.

Accordingly, we find the trial court did not err in dismissing as moot Mr. Sumlin's exception of prescription as to Mr. Jackson's alternative claim of ingratitude. This argument is without merit.

**Good Faith / Bad Faith Possessor and Value of Improvements**

In his third assignment of error, Mr. Sumlin asserts the trial court erred in denying his reconventional demand and determining the value of the improvements to be zero. Mr. Sumlin contends that the value of the improvements should have been determined as of the date of the 2015 trial. Mr. Sumlin avers Mr. Jackson donated the property to him and it is undisputed that the property was not in great condition or that he spent "thousands of dollars in improvements and expenses."

Mr. Sumlin contends that the property should also have been valued as of the time of the trial on the merits for annulling the donation in 2015. He claims the March 3, 2023 hearing was not a trial because no witnesses were called and no new

---

[18] We find the trial court's stated reason why the claim of ingratitude was not prescribed is *dicta*.

exhibits were introduced into the record. Mr. Sumlin asserts that at the March 3, 2023 hearing, arguments were presented to the trial court based on the submitted briefs regarding evidence from the 2015 trial.

In the November 9, 2015 judgment, the trial court found:

> Any improvements which Sumlin made to the property prior to Jackson's eviction obviously were made with Jackson's consent, triggering the operation of the second paragraph of Art. 493. However, any constructions made by Sumlin after Jackson's eviction from the property were made without Jackson's consent, triggering the operation of Arts. 495, as may be applicable, and 497.

In reference to La. C.C. art. 497 and any improvements made after the eviction, the trial court determined that Mr. Sumlin was in bad faith.

The provisions concerning constructions on immovables and whether a possessor is in good or bad faith are governed by the following. La. C.C. art. 493, in pertinent part, provides:

> Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.
>
> When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within ninety days after written demand, the owner of the land may, after the ninetieth day from the date of mailing the written demand, appropriate ownership of the improvements by providing an additional written notice by certified mail, and upon receipt of the certified mail by the owner of the improvements, the owner of the land obtains ownership of the improvements and owes nothing to the owner of the improvements. Until such time as the owner of the land appropriates the improvements, the improvements shall remain the property of he who made them and he shall be solely responsible for any harm caused by the improvements.

La. C.C. art. 496 governs constructions by good faith possessors and provides:

> When constructions, plantings, or works are made by a possessor in *good faith*, the owner of the immovable may not demand their demolition and removal. He is bound to keep them and **at his option** to pay to the possessor either the cost of the materials and of the workmanship, **or** their current value, **or** the enhanced value of the immovable. [Emphasis added.]

La. C.C. art. 497, governs constructions by bad faith possessors, provides:

> When constructions, plantings, or works are made by a *bad faith* possessor, the owner of the immovable may keep them or he may demand their demolition and removal at the expense of the possessor, and, in addition, damages for the injury that he may have sustained. If he does not demand demolition and removal, he is bound to pay **at his option** either the current value of the materials and of the workmanship of the separable improvements that he has kept **or** the enhanced value of the immovable. [Emphasis added.]

As to good faith possessors, La. C.C. art. 487 provides:

> For purposes of accession, a possessor is in good faith when he possesses by virtue of an act translative of ownership and does not know of any defects in his ownership. He ceases to be in good faith when these defects are made known to him or an action is instituted against him by the owner for the recovery of the thing.

To be a good faith possessor under La. C.C. art. 496, Mr. Sumlin had to make the improvements while possessing the property by virtue of an act translative of ownership, believing himself to be the owner of the property. La. C.C. art. 487; Southern Casing of Louisiana, Inc. v. Houma Avionics, Inc., 00-1930 (La. App. 1 Cir. 0928/01), 809 So.2d 1040. Mr. Sumlin would cease to be in good faith when the defects in his ownership are made known to him or an action is instituted against him by the owner for recovery of the property. La. C.C. art. 487.

In the instant case, Mr. Jackson executed the donation in favor of Mr. Sumlin on April 5, 2004, and he lived with Mr. Sumlin on the property until April 2007, when he was evicted. Therefore, we find the trial court was not manifestly erroneous in finding that any improvements made on the property by Mr. Sumlin prior to Mr. Jackson's eviction were made with Mr. Jackson's consent, and thus, Mr. Sumlin was a good faith possessor under La. C.C. art. 496.

Mr. Sumlin subsequently became aware there was a possible defect in his ownership when he evicted Mr. Jackson. When Mr. Sumlin attempted to evict him, Mr. Jackson did not appear to realize that he had donated all of his property to Mr. Sumlin. Mr. Jackson testified he called the police in an effort to prevent being

evicted from the property. He testified that he only left the property after Mr. Sumlin showed the police the donation and the police informed him that there was nothing they could do.

Additionally, Mr. Sumlin became aware of a possible defect in his ownership when Mr. Jackson instituted this lawsuit seeking to recover his property in October 2008. Thus, at the earliest, Mr. Sumlin became aware of a possible defect in his ownership upon Mr. Jackson's eviction in 2007, or at the latest, when Mr. Jackson filed this lawsuit in 2008 to recover his property. Therefore, we further find the trial court was not manifestly erroneous or clearly wrong in finding that any improvements made by Mr. Sumlin after Mr. Jackson's eviction were made without Mr. Jackson's consent, and from that point on, Mr. Sumlin was a bad faith possessor under La. C.C. art. 967.

Consequently, under La. C.C. art. 496, for any improvements made prior to Mr. Jackson's eviction in April 2007, Mr. Jackson could not demand their demolition and removal but was bound *at his option* to pay Mr. Sumlin either the cost of the materials and of the workmanship, *or* their current value, *or* the enhanced value of the immovable. For the improvements made after his eviction, Mr. Jackson did not demand demolition or removal and was bound to pay Mr. Sumlin *at his option*, either the current value of the materials and of the workmanship of the separable improvements that he has kept *or* the enhanced value of the immovable.

It was undisputed by the parties that on August 20, 2017, the improvements on the property were destroyed by a fire while the property was in Mr. Sumlin's possession.

Upon review of the evidence, we find Mr. Sumlin did not meet his burden of proving he is entitled to the value of improvements on the property as alleged in his reconventional demand. Mr. Sumlin's testimony regarding alleged improvements was woefully deficient, often inconsistent and contradictory, unsupported by

evidence, and not credible. Careful review of the record shows that although certain exhibits in support of Mr. Sumlin's alleged improvements were identified on the record in the 2015 trial, no exhibits regarding the alleged improvements were offered or admitted into evidence at the 2015 trial. Moreover, no exhibits were offered or admitted in evidence at the subsequent trial dates on Mr. Sumlin's reconventional demand in 2023.

We find Mr. Sumlin failed to provide evidence of (1) the condition of the property prior to and at the time of the donation; (2) the condition of the property prior to and after the eviction; (3) when the alleged improvements occurred (*i.e.*, prior to or after the eviction); (4) what constructions were actually on the property prior to and after the donation; (5) what constructions/improvements were done prior to and after the eviction; and (6) the value of improvements made prior to and after the eviction. Therefore, regardless of what date the trial court should have used to determine the value of the improvements, Mr. Sumlin did not establish by credible evidence that he made *any* improvements.

Accordingly, we find the trial court was not manifestly erroneous or clearly wrong in denying Mr. Sumlin's reconventional demand and finding the value of the improvements to be zero. This assignment of error is without merit.

**DECREE**

For the reasons stated above, we affirm the trial court's November 9, 2015 partial judgment annulling and setting aside the donation, and in dismissing Mr. Sumlin's exception of prescription as moot. We further affirm the trial court's March 3, 2023 judgment denying Mr. Sumlin's reconventional demand.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **APRIL 10, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**23-CA-329**

**E-NOTIFIED**
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE M. LAUREN LEMMON (DISTRICT JUDGE)
RALPHAEL BICKHAM (APPELLANT)          GEORGE R. KETRY, JR. (APPELLEE)

**MAILED**